1
2
3          **UNITED STATES DISTRICT COURT**
4             **DISTRICT OF NEVADA**
5
6   JOHN RAY VELLA,                              )
7                    Plaintiff,                   )   Case No.  2:15-cv-01560-APG-GWF
                                                  )
8   vs.                                           )   **FINDINGS AND**
                                                  )   **RECOMMENDATION**
9   CAROYN W. COLVIN, Acting Commissioner,        )
    Social Security Administration,               )
10                                                )
                   Defendant.                     )
11  _____     )

12         This matter is before the Court on Plaintiff John Ray Vella's Complaint to Set Aside the

13  Final Order of the Commissioner Pursuant to 42 U.S.C. §§ 405(G) and 1383(C)(3) (ECF No. 1),

14  filed on August 14, 2015.  The Acting Commissioner filed her Answer (ECF No. 8) on October 16,

15  2015.  Plaintiff filed his Motion for Remand (ECF No. 12) on November 18, 2015.  The Acting

16  Commissioner filed her Cross Motion to Affirm and Opposition to Plaintiff's Motion for Remand

17  (ECF No. 17) on February 4, 2016.   Plaintiff did not file a reply brief.

18                              **BACKGROUND**

19         **A.     Procedural History.**

20         Plaintiff John Vella filed an application for Social Security Disability benefits on January 23,

21  2012, alleging that he became disabled on March 2, 2009.  *See* Administrative Record ("AR") 258-

22  265.  The Commissioner denied Plaintiff's application initially on March 20, 2012, and upon

23  reconsideration on June 19, 2013.  AR 93-106, 111-132.  Plaintiff requested a hearing before an

24  Administrative Law Judge ("ALJ").  An initial hearing was conducted on July 15, 2014 before ALJ

25  Teresa L. Hoskins Hart during which Lowell Sparks, M.D., an internal medicine specialist, and

26  James M. Haynes, M.D., a neurologist, testified.  AR 75-92.  The hearing was continued to

27  November 17, 2014 at which Robert J. McDevitt, M.D., a psychiatrist, testified.   Plaintiff also

28  testified at this hearing, as did vocational expert Dr. Robin Generaux.  AR 39-74.  The ALJ issued

her decision on February 24, 2015. The ALJ concluded that Plaintiff was disabled from September 2, 2009 through January 20, 2012, but was not disabled thereafter. AR 15-32. Plaintiff's request for review by the Appeals Council was denied on June 16, 2015. AR 1-3. Plaintiff then commenced this action for judicial review pursuant to 42 U.S.C. § 405(g). This matter has been referred to the undersigned magistrate judge for findings and recommendations.

**B.    Factual Background.**

Plaintiff challenges only the ALJ's determination that he did not have a severe mental impairment that rendered him incapable of any gainful employment after June 19, 2012. The following factual background therefore focuses on Plaintiff's alleged mental impairments.

Plaintiff John Vella was born on September 4, 1967. He is 5'9" tall and weighed 270 pounds at the time of his disability report. Mr. Vella was employed as an ironworker from 2007 to 2009. Prior to that he worked as a construction safety inspector from 2004 to 2007; a hotel maintenance engineer or "houseman" from 2001 to 2003; and a taxi/limousine driver from 1997 to 2000. AR 303-312. Mr. Vella has a high school diploma. He attended a highway patrol school in Texas to become a deputy sheriff, but did not finish. He received job training through the iron workers union. He also studied respiratory therapy at a community college. AR 59-62.

On March 2, 2009, Plaintiff was working on a construction project in Las Vegas, Nevada. He and another worker were on a lift device with a cage at the top. The device malfunctioned, causing the cage to slam against the building and break through two walls. Plaintiff was thrown around inside the cage. AR 428. After the accident, Mr. Vella drove home in his own vehicle and went to the Concentra Medical Center later that day. AR 442. He reported pain mostly to the anterior parts of his body– shoulders, chest wall, forearms, knees and ankles. In follow-up medical visits on March 5 and 10, 2009, Plaintiff complained of pain in the cervical and lumbar spine regions, left knee, ankle and foot. AR 422-428. There was no indication in these initial medical records that Plaintiff had sustained a head injury. During a medical consultation on September 21, 2009, however, Plaintiff reported that he "had possible loss of consciousness" in the accident. AR 442.

Plaintiff filed a worker's compensation claim and received extensive medical treatment for physical injuries resulting from the accident. According to an April 4, 2011 report by Dr. Firooz

2

Mashood, Plaintiff incurred the following work related injuries/medical procedures:  Cevical spine sprain/strain; lumbar spine sprain/strain superimposed on a central disc herniation at L4-L5; closed head injury with reported loss of consciousness without residual; chest wall contusion and chest pain; thoracic spine sprain/strain superimposed on disc herniation at T6-T7; left wrist sprain/strain; right elbow injury requiring arthroscopic with synovectomy on June 25, 2009; left shoulder injury requiring arthroscopy, subacromial decompression, debridement and synovectomy on August 5, 2009; left knee arthroscopic partial meniscectomy on October 15, 2009; right knee arthroscopic partial medial meniscectomy on October 29, 2009; left ankle arthroscopy with extensive debridement on January 18, 2010; and right ankle arthroscopy with extensive debridement on August 30, 2010. Plaintiff also complained of difficulty with bladder function.  AR 996.  Dr. Mashood noted that Plaintiff stated that he sustained a head injury and experienced momentary loss of consciousness in the accident.  Plaintiff denied any headaches, but reported occasional impaired memory.  He also denied visual disturbances or hearing loss.  AR 994.  Dr. Mashood noted that Plaintiff would be seeing a neurologist.[1]

Plaintiff was seen by Dr. Daniel Broeske, neurologist, on May 25, 2011.  Plaintiff told Dr. Broeske that he was conscious throughout the accident, but that approximately two months later he "became aware of progressive perceived memory impairment, irritability, outbursts of rage, sleep disturbance as well as occasional flashbacks to the incident."  AR 588.  He reported "difficulty registering information verbally conveyed to him by his wife and others and easy distractibility."  AR 588.  Plaintiff had not yet tried antidepressant or anxiolytic therapy and he was in the process of being scheduled for a psychiatric evaluation.  Plaintiff stated that he had a headache about once a week, but did not take headache medication.  Dr. Broeske noted that Plaintiff was extremely frustrated by his incapacity following the accident.  AR 588.  Under "Neurologic," Dr. Broeske noted that Plaintiff complained of difficulty with concentration, poor balance, headaches

---

[1]Dr. Mashood identified himself as the "Designated Impairment Evaluator," and his role appeared to be to oversee Plaintiff's medical care for his work related injuries, determine when he reached maximum medical improvement for those injuries, and provide a functional capacity evaluation relating to Plaintiff's ability to return to work.  During Dr. Mashood's visits, Plaintiff's nurse/case manager was present.  AR 912-998.

and disturbances in coordination, falling down, visual disturbances, and memory loss.  AR 589. Under "Psychiatric," he noted that Plaintiff complained of anxiety, depression and thoughts of violence.  AR 589.  Dr. Broeske stated that musculoskeletal, cranial nerves, and neurologic examination findings were normal.  Under "Mental Status Exam," Plaintiff was noted to be oriented to date, time and place.  He had 2/3 memory at 3 minutes with distraction.  He could spell "world" backwards.  There was no language aphasia.  Plaintiff scored 29 out of 30 on the Mini Mental State Exam.  AR 590.  Dr. Broeske stated that Plaintiff had probable posttraumatic stress disorder and that he possibly suffered a mild concussion in the accident.  Plaintiff appeared to have postconcussive syndrome symptomatology with residual vascular headaches, as well as mood instability, irritability, sleep disturbances and memory impairment as objectively determined by the Mini-Mental status examination.  Dr. Broeske recommended that a brain MRI be obtained and agreed with the need for formal psychiatric evaluation.  He prescribed Lortab and Soma medication.  AR 591.

Dr. Broeske next saw Plaintiff on July 11, 2011 at which time he reported some improvement in his mood instability.  Plaintiff estimated that he had "only about three such attacks" during the past months each lasting about 6 hours.  He was still experiencing occasional flashbacks.  An electroencephalogram was normal.  The brain MRI was not available for review due to technical difficulties.  Plaintiff had not yet had his psychiatric evaluation.  Plaintiff complained of fatigue, eye irritation, eye pain and light sensitivity, ringing in ears, decreased hearing, nosebleeds, chest pain, lightheadedness, swelling of hands and feet, weight gain and excessive snoring.  AR 585.  Dr. Broeske encouraged Plaintiff to obtain a psychiatric evaluation and noted that he seemed "to be making good symptomatic progress overall."  AR 587.

On September 12, 2011, Plaintiff reported that he was still experiencing flashbacks and other posttraumatic symptomatology on a fairly frequent basis.  He was scheduled to see Dr. Ross, a neuropsychologist, in the near future.  AR 580.  Dr. Broeske stated that "[f]ortunately, he does seem to be experiencing fewer mood instability attacks as time goes on." AR 582.  On November 8, 2011, Dr. Broeske noted that Plaintiff had completed six counseling sessions with Dr. Ross.  Plaintiff reported that his pain had diminished considerably.  He was no longer taking Vicodan and was using Lortab sparingly.  "He feels that he is benefitting from the psychological intervention at this time."

1   AR 576.  Dr. Broeske stated that he would implement as deemed appropriate the psychological

2   medications recommended by Dr. Ross.  AR 578.

3        On December 14, 2011, Plaintiff reported "continued progress in terms of his symptoms of

4   anxiety and jitteriness.  Cymbalta even at a low dose of 30 mg has been helpful to him. . . .  He

5   seems to be having fewer panic-like attacks in recent weeks."  AR 572.  Dr. Broeske stated that

6   "[t]he patient believes that there has been significant symptomatic improvement and, in agreement

7   with the recommendations made by his psychologist, I shall have him advance the dose of Cymbalta

8   as tolerated to 60 mg taken at nighttime."  AR 574.  Plaintiff stated that he did not believe he needed

9   the speech therapy recommended by Dr. Ross.  AR 574.  On February 14, 2012, Plaintiff reported

10  reduced pain and that he was continuing to receive psychological therapy from Dr. Ross.  The

11  increased dosage of Cymbalta also conferred benefit.  AR 569.  Dr. Broeske increased the Cymbalta

12  to 90 mg at nighttime.  AR 571.  On March 14, 2012, Dr. Broeske noted that Plaintiff had benefitted

13  from the higher dosage of Cymbalta and was having less generalized pain and depressive symptoms.

14  The Cymbalta also provided some relief for his headaches, but he was still having them several times

15  per week.  AR 564.  Dr. Broeske regarded Plaintiff as being at maximum medical improvement,

16  stable and ratable.  He noted that Plaintiff had some persistent short term memory problems

17  subjectively.  AR 566.  There is no record that Dr. Broeske saw Plaintiff after March 14, 2012.

18       Dr. Staci Ross, a clinical neuropsychologist, performed a psychological evaluation of the

19  Plaintiff on August 31, 2011 and a neuropsychological evaluation on September 30, 2011.  AR 672-

20  683.  Dr. Ross stated that Plaintiff demonstrated "significant, severe symptoms of anxiety,

21  depression, heightened somatic focus, interpersonal difficulties, homicidal and suicidal ideation, with

22  no intent to harm."  AR 675.  Behaviorally, he demonstrated "marked pain and stiffness, as well as

23  visible stress in terms of agitation, anxiety, tearfulness, as well as reduced confidence level, and

24  attentional difficulties.  Cognitively, he is reporting and observed to have attentional memory

25  difficulties, and adaptively, he is impacted in all areas related to a combination of psychological,

26  physical and reported cognitive difficulties."  AR 675.  Dr. Ross's diagnosis was major depression,

27  posttraumatic stress disorder; and pain disorder, secondary to general medical condition.  She stated

28  that Plaintiff had mild cognitive impairment that appeared to be impacted by a history of probable

1   mild traumatic brain injury and ongoing severe psychological distress and pain experience.   AR 682.

2        Dr. Ross provided psychological counseling to Plaintiff on September 19 and 26, October 17

3   and 26, November 2, 16, and 30, December 14, 2011, January 9 and 23, and February 13, 2012.  AR

4   1148-115, 654-656.  These specific dates are noted in light of the ALJ's statement that Plaintiff did

5   not see Dr. Ross during the approximate six month period prior to filing his application for Social

6   Security disability on January 18, 2012.  The ALJ stated that Plaintiff's session with Dr. Ross on

7   February 13, 2012 was the first time he had seen her since September 30, 2011.  AR 21.  The records

8   also show that Dr. Ross provided counseling to Plaintiff on a bi-monthly basis from March 5, 2012

9   to June 11, 2014.  Dr. Ross also provided counseling on September 17, 2014 and January 7, 2015.

10  AR 655-671, 1112-1147, 1174, 1119.

11       Dr. Ross's progress notes contained only generalized descriptions of Plaintiff's anxiety,

12  depression or anger symptoms.  A typical note stated that "[h]e reported continuing to experience

13  ongoing symptoms of posttraumatic stress disorder which are significantly debilitating for him, with

14  ongoing flashbacks, nightmares, reliving experiences with increased general arousal; however,

15  symptoms of anxiety and anger, he has been improved with current medical management and

16  ongoing treatment.  In addition, continue to discuss ongoing cognitive difficulties he is experiencing

17  at this time."  AR 656, *March 26, 2012 Progress Note*.  Dr. Ross's "Impressions" were similarly

18  general:  "Overall Mr. Vella continues to[sic] demonstrate a gradual trend for improvement with

19  residual symptoms of anxiety, depression and cognitive difficulties, consistent with industrial injury.

20  Previously noted reduced anger control continues to be improved.  He continues to be very motivated

21  for therapy.  He denies suicidal ideation."  AR 657, *April 12, 2012 Progress Note*.  The progress

22  notes indicated that Plaintiff's depression, anxiety and anger waxed and waned over the course of the

23  psychological counseling, but with Dr. Ross consistently noting a gradual or continuing trend for

24  improvement.  AR 654-671.

25       Dr. Ross wrote a September 17, 2013 letter to a vocational specialist-consultant regarding

26  whether Plaintiff was able to participate in a vocational training program.  Dr. Ross stated:

27            From a psychological standpoint, given the severity of posttraumatic
          stress disorder, depression, and reduced anger control, as well as his

28            psychological responses to his increased pain episodes, I do not think it

> is possible that Mr. Vella is able to return to work.  He presents with marked variability in his emotional functioning, which will impact his motivation and follow through with work related tasks, as well as accuracy in doing so.  At times, he has difficulties completing daily tasks secondary to variability in concentration, motivation, follow through, pain experience, coping and emotional control.

AR 1134.

Dr. Ross wrote a September 30, 2013 rebuttal report to the opinions of Dr. Robert F. Asarnow, a psychologist who conducted an independent medical evaluation of Plaintiff in July 2013. AR 1126-1132.[2]  Although Dr. Asarnow's report is not included in the record, Dr. Ross stated that he had opined that there was no evidence that Plaintiff sustained a brain injury as a result of the March 2, 2009 accident.  Dr. Asarnow also reportedly stated that there was no evidence that Plaintiff was experiencing clinically significant cognitive impairment; and that there were questions whether he had given full effort during psychological testing or was exaggerating his psychiatric symptoms.  AR 1127-1129.  Dr. Ross provided a lengthy and somewhat convoluted rebuttal to Dr. Asarnow's opinions.  She stated that Plaintiff had mild cognitive impairments resulting from the accident and continued to demonstrate symptoms of depression, anxiety, interpersonal difficulties, reduced anger control, and other symptoms associated with posttraumatic stress disorder.  Although Plaintiff's symptoms had improved through therapy, she recommended that he continue to receive psychotherapy treatment.  AR 1131.[3]

---

[2]It appears that Plaintiff was involved in litigation regarding the alleged injuries he sustained in the March 2, 2009 accident.

[3]Dr. Asarnow's opinions were also discussed in an October 9, 2014 report prepared by Dr. Charles Quaglieri who stated:

> The patient underwent a neuropsychological evaluation in July 2013 and a report was issued on August 17, 2013 by Dr. Asarnow.  It was his conclusions that there was no evidence that the patient sustained a brain injury as a result of the March 2, 2009 accident.  He was able to drive himself home and during the first 6 weeks he never complained of concussive syndrome or memory loss.  He thought there was no evidence that he was experiencing cognitive impairments.  He noted that the patient had anxiety and depression.  He thought he had some symptoms of PTSD.

AR 1184.

1    Dr. Broeske referred Plaintiff to Theresa Stempien, a certified Speech and Language

2    Pathologist for evaluation and speech/language therapy.  In her June 27, 2012 report, Ms. Stempien

3    stated that because Plaintiff was three years post-injury, he had most likely developed compensatory

4    strategies, positive or not, for his cognitive impairments and verbal challenges.  She also noted that

5    he presented with significant frustration and depressive affect secondary to his ongoing post-

6    traumatic injuries and chronic daily pain.  AR 595.  Ms. Stempien administered formal tests to

7    diagnose aphasia, and cognitive deficits.  She stated that even though Plaintiff performed relatively

8    well on formal test batteries,  his cognitive functioning was moderately impaired.   Plaintiff's

9    phonation (speech sounds) was clear and breath control was within normal limits.  His

10   conversational discourse was disjointed and scattered, with frequent tangents and some verbal

11   paraphasic errors noted.  Plaintiff reported that he was easily distracted and immediately forgot

12   things and tasks.  AR 598.  Ms. Stempien provided speech and language therapy to Plaintiff from

13   June 27, 2012 through August 9, 2012.  AR 600-620.  On August 10, 2012, Ms. Stempien reported

14   to Dr. Mashood that Plaintiff had made small gains in treatment and recommended an additional 4

15   week period of therapy at 2 times per week.  AR 621.  Dr. Mashood, however, did not prescribe

16   additional speech therapy.

17   Beginning on April 4, 2011, Dr. Mashood saw Plaintiff approximately every two weeks to

18   update his medical condition and assess whether he had reached maximum medical improvement.

19   On April 21, 2011, Dr. Mashood noted that Plaintiff was scheduled to see a urologist and a

20   psychiatrist and that a neurology evaluation was pending.  On May 5, 2011, he noted that Plaintiff

21   had not yet seen the urologist, psychiatrist or neurologist.  He recommended that Plaintiff be released

22   to work with limitations including lifting no more than 20 pounds and avoiding repetitive bending,

23   prolonged standing, and walking no more than 1 hour per shift.  AR 985-88.  On June 2, 2011, Dr.

24   Mashood noted that Plaintiff had seen a neurologist who recommended an MRI study of the brain

25   and an EEG study.[4]  He noted that Planitiff "has been advised that he is suffering from posttraumatic

26   stress disorder and he needs to visit a psychologist."  AR 976.  Dr. Mashood gave Plaintiff a referral

27   ───────────────

28       [4]Dr. Broeske made these recommendations on May 25, 2011.  AR 591.

to see Dr. Mortillaro, a psychologist.  AR 977.

On August 18, 2011, Dr. Mashood noted that Plaintiff had been referred to Dr. Ross, instead of Dr. Mortillaro, and he listed "reactive depression and anxiety" as one of Plaintiff's diagnoses.  AR 962-963.  On September 15, 2011, Plaintiff reported that Dr. Ross told him that he was suffering from posttraumatic stress disorder and would require psychological counseling.  Dr. Mashood continued to recommend that Plaintiff be released to return to work with the lifting and movement limitations.  AR 960.  On November 17, 2011, Plaintiff reported that he was still experiencing anxiety and had been told that he would require long-term counseling.  Dr. Mashood, however, did not believe that Plaintiff needed long-term psychological counseling.  He noted that Plaintiff was not anxious or depressed during his examinations of him.  He stated that Plaintiff should gradually wean himself off of Xanax.  AR 951.  In his December 12, 2011 report, Dr. Mashood stated that he also advised Plaintiff on November 17, 2011 "to complete psychological intervention."  AR 947.  Dr. Mashood stated that it was unfortunate that Plaintiff "is still receiving psychological therapy under Dr. Ross' supervision for reasons unknown.  He reports that he is experiencing episodes of depression and anxiety."  AR 947.  Dr. Mashood stated that the only thing preventing Plaintiff from being considered at maximum medical improvement was the psychological intervention "which should be completed soon."  AR 947.  Dr. Mashood stated that he would give Plaintiff another four weeks in which to complete his psychological counseling, at which time he  would consider Plaintiff's medical condition permanent and stationary.  He did not believe that Plaintiff needed further psychological therapy.  AR 948.

On January 10, 2012, Dr. Mashood stated that a review of Dr. Ross's records indicated that Plaintiff was making good progress.  He was taking Xanax 1 q.h.s. and Cymbalta 2 q.h.s. and had an appointment to see the neurologist.  Plaintiff complained of pain in the neck, low back, knees, ankles and elbows.  Dr. Mashood stated that Plaintiff would gradually wean himself off  his current medications and cease psychotherapy.  AR 945.  On January 19, 2012, Dr. Mashood prescribed Lortab and a Lidoderm patch and referred Plaintiff for a functional capacity evaluation.  AR 942.  On January 31, 2012, Dr. Mashood noted that Plaintiff's chest pain was subsiding, he was doing well overall and had completed his functional capacity evaluation.  Dr. Mashood gave Plaintiff a "last"

prescription for Lortab and a Lidoderm patch and released him to return to work with permanent restrictions, including maximum lifting of 50 pounds, avoidance of reaching overhead, prolonged standing, and walking no more than 2 hours per shift.  AR 939.

Dr. Mashood next saw Plaintiff on July 6, 2012 at which time Plaintiff reported that he was now receiving psychological intervention twice per week for progressively worsening symptoms. Plaintiff complained of impaired memory, talking to himself when he was thinking, and having bursts of anger.  Plaintiff also complained of tinnitus in both ears which was becoming worse.  Dr. Mashood noted that none of these symptoms were present at the previous evaluation in January 2012.  Plaintiff was not taking any pain medication "even though he is experiencing so much pain involving different parts of his body."  AR 934.  Dr. Mashood gave Plaintiff a prescription for Lortab and encouraged him to continue exercises.  AR 936.  On July 19, 2012, Plaintiff provided Dr. Mashood with Dr. Ross's July 12, 2012 progress note.  Plaintiff stated that he was continuing to experience chronic pain in multiple areas of his body, including neck and back pain which was well controlled by Lortab.  He stated that he was depressed, had thoughts of harming people, and had pushed his wife against the wall two weeks earlier.  AR 932.  Dr. Mashood commented that "[what] the patient is saying regarding his pain management and his anger behavior is different than what Dr. Ross has documented in his report which raises the question whether his symptomatology and presentation are real or not."  AR 932.  He noted that Plaintiff did not demonstrate significant pain behavior.  His gait was normal, and there were no muscle spasms or tightness of the cervical, thoracic and lumbar paraspinal muscles.  Range of motion of the cervical and lumbar spine was near normal range.  Neurological examination showed 5/5 muscle strength and symmetrical reflexes.  Dr. Mashood recommended that Plaintiff be referred to a psychiatrist for evaluation.  He stated that there was no need for Plaintiff to follow up with a neurologist or to see Dr. Ross.  AR 932-933.

On August 2, 2012, Dr. Mashood noted that Plaintiff "is doing better since he has not seen the psychologist."  AR 928.  (Dr. Ross also saw Plaintiff on August 2, 2012.)  Plaintiff was awaiting authorization to see a psychiatrist and an ENT physician.  Dr. Mashood noted that he was under the care of a speech therapist "for unknown reasons."  AR 928.  Dr. Mashood stated that Plaintiff's reported episodes of anger behavior associated with depression were not supported by Dr. Ross's

report of July 12, 2012.  He also indicated that there were inconsistencies between Dr. Ross's report and Plaintiff's reports of pain on previous evaluation.  Dr. Mashood stated that there was no need for Plaintiff to treat further with the speech pathologist.  He instead needed to see a psychiatrist and an ENT physician.  AR 929.  Dr. Mashood continued Plaintiff on his current medications.  AR 929.

On August 16, 2012, Dr. Mashood noted that Plaintiff was currently on Cymbalta, and Xanax and was taking Lortab very occasionally.  He was still under Dr. Ross's care and had finished speech therapy.  He noted that Dr. Ross's August 2, 2012 report indicated that Plaintiff was still experiencing psychological symptoms.  AR 926.  Dr. Mashood noted, however, that Plaintiff's mood was normal and he was not angry or depressed during the examination.  Plaintiff communicated with him and the case manager without difficulty and did not express symptoms of depression or anxiety.  Dr. Mashood stated that he was very concerned about what happened after he saw Plaintiff on January 31, 2012.  He questioned whether Plaintiff's psychological symptoms in July 6, 2012 were motivated by his belief that he would be declared at maximum medical improvement and released to return to work.  Dr. Mashood reiterated that Plaintiff needed to see a psychiatrist.  He further stated that his observation of Plaintiff's mental state was different from what was reported by Dr. Ross and the speech pathologist.  He stated that Plaintiff "may benefit from a different type of medication for management of anger behavior and depression, if they do exist."  AR 927.

On September 17, 2012, Plaintiff complained of neck, back, shoulder, elbow, knee and ankle pain, as well as "persistent anger behavior and impaired memory."  AR 924.  Dr. Mashood reiterated that Plaintiff needed to see a psychiatrist.  On October 24, 2012, Dr. Mashood noted that Plaintiff had still not seen a psychiatrist.  He prescribed Cymbalta, Xanax and Lortab.  AR 923.  On November 19, 2012, Plaintiff reported that he was awaiting authorization to see the psychiatrist.  Dr. Mashood noted that he was still being treated by a psychologist and his symptomatology had not changed.  AR 920.  On December 17, 2012, Plaintiff complained of edema in the lower extremities, and pain in the neck, back, elbows, knees, ankles and chest wall.  Dr. Mashood prescribed Cymbalta, Xanax and Lortab.  AR 919.  On January 14, 2013, Plaintiff reported headaches originating from both eyes, extending to the forearms and back to the occipital area.  He complained of pain in left shoulder, elbows, knees, ankles, and low back.  He also complained of hand numbness.  Dr.

11

1   Mashood again prescribed Cymbalta, Xanax and Lortab and scheduled Plaintiff for a urine

2   toxicology test.  AR 917.

3        Dr. Mashood reported on February 11, 2013 that the urine toxicology test showed no

4   metabolites of Xanax or Lortab in Plaintiff's system.  This indicated to Dr. Mashood that the

5   Plaintiff was not taking the prescribed medications.  Dr. Mashood discussed the test results with

6   Plaintiff who claimed that he had taken a "cleanser" which explained the absence of metabolites in

7   his system.  AR 913.  Dr. Mashood reiterated that Plaintiff needed to see a psychiatrist.  He released

8   Plaintiff from his care and stated that upon completion of a psychiatric evaluation, Plaintiff's case

9   should be considered permanent and stationary, medically stable and ready for an impairment

10  evaluation.  Dr. Mashood suspected that a psychiatric evaluation would be negative for any residual

11  cognitive deficit or posttraumatic stress disorder.  AR 914.

12       Dr. Mark O. Reed saw Plaintiff on May 8, 2013.  Plaintiff complained of chronic pain in the

13  neck, back, and elbow.  He also disclosed his history of posttraumatic stress disorder and his

14  psychological counseling with Dr. Ross.  Dr. Reed stated that Plaintiff was pleasant and cooperative,

15  but also very talkative and the doctor had to redirect him on multiple occasions.  AR 1059.  Dr. Reed

16  next saw Plaintiff on May 23, 2013 at which time Plaintiff's nurse/case manager was also present.

17  Dr. Reed noted that there were questions regarding Plaintiff's noncompliance with prescribed

18  medications based on the urine toxicology test obtained by Dr. Mashood.  Dr. Reed was also

19  concerned about Plaintiff's use of multiple medications and informed him that he would not be

20  renewing his multiple medications.  The nurse/case manager proposed a urine drug screen which the

21  Plaintiff adamantly refused.  Dr. Reed stated that Plaintiff was "very aggressive and quite unhappy

22  here with these opinions.  He reports that he has been deemed totally disabled by the Iron Worker's

23  Union and that he has no intention of returning back to any type of even restricted duty

24  employment."  AR 1049.   Plaintiff became very adamant and angry while discussing the repeat drug

25  screen.  Dr. Reed stated "that during this tirade, he easily flexes and extends his neck, gestures

26  violently with his arms and shoulders, leans forward quite easily with his low back area."  AR 1050.

27  Under "Assessment," Dr. Reed stated that Plaintiff's subjective complaints greatly outweighed the

28  objective medical findings.  AR 1050.

12

1    On June 12, 2013, Dr. Reed noted that Plaintiff had completed a functional capacity

2    evaluation which placed him in the sedentary to light work category.  Dr. Reed, however, got the

3    distinct impression "that he is not wanting to return to work in any capacity."  AR 1045.  Dr. Reed

4    also noted that Plaintiff laughed, smiled, and was very cooperative and pleasant during this visit, in

5    contrast to his behavior on May 23, 2013.  On July 23, 2013, Dr. Reed counseled Plaintiff at length

6    regarding his need to minimize his use of Lortab for what was probably a chronic musculoskeletal

7    condition.  He stated that Plaintiff exhibited a lot of verbosity, and talked in circles regarding the

8    discussion about Lortab.  AR 1035.

9    Dr. Carla Perlotta performed a psychological evaluation of Plaintiff on May 21, 2013 at the

10   request of the Bureau of Disability.  Dr. Perlotta noted that Plaintiff's written Function Report listed

11   a history of PTSD, memory loss, ringing in the ears, hearing loss and chronic pain.  Plaintiff reported

12   difficulty with personal care, but that he was able to prepare simple meals, do small loads of laundry

13   and put clothes away.  He was able to go out riding in a car, but did not drive himself because of

14   pain, PTSD, memory loss, headaches, and medication reaction.  Plaintiff was able to go out alone

15   and shop in stores for various items.  He reported that he was not able to pay bills, handle a savings

16   account, or use a checkbook, but could count change.  He did not spend time with others and was not

17   able to follow verbal or written instructions.  Plaintiff reported that he had frontal and temporal lobe

18   brain damage and scar tissue.  AR 722.  *See also* Plaintiff's Function Report-Adult.  AR 338-346.

19   Plaintiff told Dr. Perlotta that he couldn't remember anything and had bad headaches.  He

20   stated that he "was knocked out three times during the accident" and had problems with memory,

21   concentration, rages, ringing in the ears, chronic pain, headaches and automatic reflexes."  AR 722.

22   He had problems with PTSD and was jumpy, hypervigilant and would grab onto things, sometimes

23   breaking them.  He disliked crowds.  He had flashbacks twice a month and had periods of crying and

24   rages.  He became very emotional when he saw machines similar to the one involved in the accident

25   and avoided places that reminded him of the accident.  AR 722-23.  He would sometimes zone out

26   and disassociate.  He had intrusive thoughts and would become emotional when he talked about what

27   happened.  He was unable to work on a computer screen more than fifteen minutes because of

28   headaches.  He also had problems with depression.  "[H]e was down daily and did not enjoy his

1   regular activities." AR 723.  He isolated himself and would not leave the house.  He had problems

2   with concentration and sleep.  He had feelings of worthlessness, guilt and hopelessness.  He had

3   passive thoughts of self-harm, but no plan or intent.  He would think about hurting others, but these

4   were only impulsive thoughts and he had no plan or intent to harm others.  AR 724.  Dr. Perlotta

5   noted that although Plaintiff did not go to the hospital immediately after the accident, "[h]e reported

6   that he broke his ankles, feet, hips, shoulders, ribs, elbows, neck, wrists, head, knees, legs, upper and

7   lower back and hands."  AR 723.  In order to reduce pain, he took prescription medications all the

8   time and attended physical therapy.  Plaintiff's current medications included Lortab, Cymbalta,

9   Alprazolam, Fioricet, Lidoderm, and Diazepam.  AR 722-723.

10          Dr. Perlotta noted that Plaintiff was adequately dressed and sufficiently groomed.  His facial

11   expression and motor activity were not excessive.  He had some large gestures with his arms.  His

12   interactions were friendly and open.  Plaintiff's speech quality was a little loud.  His pronunciation

13   was fairly clear, but with a mild stutter.  He demonstrated difficulty at times in finding words.  His

14   speech was well organized and relevant to the discussion.  Plaintiff's mood was sober, sad, uneasy

15   and somewhat variable.  He was easily upset.  His affect was sober and almost tearful, but generally

16   appropriate to the context of the conversation.  Plaintiff stated that he was not experiencing any

17   auditory or visual hallucinations.  Delirium, dementia, amnesia, cognitive disorders, thought

18   disorders, and psychotic disorders were not apparent.  Plaintiff was oriented to person, place, time

19   and the purpose of the visit.  AR 724.

20          On cognitive function tests, Plaintiff scored low average on the digit span tests.  On serial

21   7's, he completed fourteen calculations without error.  His short term memory was poor.  AR 725.

22   His delayed memory was marginally better.  His immediate memory was within low normal limits

23   based on the digital span trials.  His long term memory appeared intact and his fund of information

24   was below average.  Plaintiff showed poor judgment on vocabulary testing.  AR 725.  Dr. Perlotta

25   stated that Plaintiff appeared to be putting forth good effort and attempted all tasks that were

26   requested of him.  The only unusual inconsistency was Plaintiff's statement that he had broken

27   nearly every bone in his body, yet he never went to the hospital.  Dr. Perlotta stated that "[i]t seems

28   unlikely that he would be able to walk around with broken ankles and knees."  AR 726.

Plaintiff told Dr. Perlotta that a typical day consisted of waking up at 4:30 A.M, eating breakfast, showering and reading the Bible.  In the afternoon, he would complete his homework and do Luminosity, a computer program to help with cognitive issues.  In the evening, he ate dinner, spent some time with his girlfriend, and went to bed between 9:30 and 12:30 A.M.  He would have to get up every two hours due to bladder problems.  "He would wake up and sweat, grabbing his girlfriend or a nearby object.  Sometimes he would break objects.  He had nightmares.  He was scared with no feeling in his arms and legs and this happened nightly.  In order to help him sleep, he took Cymbalta, Xanax, Valium and a pain patch."  AR 726.  Plaintiff talked to family members every day, used the phone to call family and friends, and occasionally went out the eat with family and friends.  He attended church.  For recreation, he visited at a friend's house and watched movies.  He helped with cooking and laundry.  He found it difficult to drive.  He was able to go shopping, but needed the help of another person.  He also received help in handling money.  He was able to take care of his personal hygiene and dress himself.  "He was not able to concentrate on a task until he finished it."  He was not able to understand and remember what he read or programs that he saw on television.  AR 726.

Dr. Perlotta stated that Plaintiff was "functioning in the Low Average range of intellectual ability."  AR 726.  He would likely have some difficulty understanding, remembering, and carrying out an extensive variety of complex instructions and in following detailed instructions without significant support such as receiving instructions in multiple formats and having a reference back to them.  Plaintiff demonstrated good social skills and did not appear to have difficulty in his ability to interact with others, although he reported periods of rage when he had thoughts about hurting others.  Plaintiff's ability to attend and concentrate would be interrupted intermittently due to his pain and emotional issues.  AR 726-27.  His prognosis depended primarily on his physical condition.  Dr. Perlotta noted that "[h]e had seemingly been through an incredible traumatic accident, resulting in much damage to his body and brain.  His emotional issues were likely related to his head trauma and accident in general."  AR 727.  Dr. Perlotta stated that Plaintiff would benefit from both psychiatric and therapeutic support to assist him in remediating his symptoms of anxiety, depression and chronic pain.  She also stated that Plaintiff would likely require extensive rehabilitation given the level of his

described injuries.  AR 727.

Dr. Richard Pratt of Oasis Counseling, LLC performed a psychological evaluation of Plaintiff in January 2014 at the request of AIG Insurance.  AR 1168-1171.  Based on the history provided by Plaintiff and his wife, Dr. Pratt noted that Plaintiff had undergone surgeries on the elbows, knees, shoulder and ankles, and was scheduled for back surgery.[5]  AR 1168.  Dr. Pratt stated that Plaintiff suffered frontal lobe brain damage and significant memory impairment as a result of the March 2, 2009 accident.  He noted that Plaintiff had been diagnosed with frequent and severe headaches and concentration disturbance.  Plaintiff's wife's reported that he suffered from excessive sleeping during the day, followed by restlessness at night, lack of communication and withdrawal behavior, poor personal hygiene, increase in temper outbursts, having a "far away" look, and getting lost inside his thoughts.  AR 1169.  Dr. Pratt stated that Plaintiff's insight and judgment were impaired as evident throughout testing.  His thinking was very concrete and literal which was consistent with head injury and unilateral brain damage.  Plaintiff was oriented to person, place and time.  His memory was believed to be impaired–primarily at the visual levels of encoding.  AR 1169.  Dr. Pratt reviewed Dr. Ross's records and noted that Plaintiff had severe concentration difficulties which impeded his ability to fully absorb Dr. Ross's therapy and training.  The combination of PTSD and organic impairment "mean that he will be workable while in the office, with difficulty, but will forget to followup with suggestions given to him by his therapists when he returns home."  AR 1170.

In a reference to Dr. Mashood, Dr. Pratt stated that it was "apparent that Mr. Vella's treatment was interrupted by another Doctor insisting that he see a Psychiatrist."  Dr. Pratt stated that a psychiatrist was not the appropriate medical professional to treat Plaintiff's mental condition because psychiatrists do not offer therapy, but instead write prescriptions for psychotropic medication.  AR 1170.  Dr. Pratt stated that it was his professional opinion that Plaintiff had significant brain injury, including post-concussion syndrome and severe memory disturbance.  He was also suffering from posttraumatic stress disorder and underlying depression.  AR 1170.  He

---

[5]The medical records indicate that Plaintiff was determined to not be a candidate for back surgery despite his complaints of back pain.

1   stated that Dr. Ross's treatment was appropriate, even though it did not result in recovery.  Dr. Pratt

2   stated that "most recovery will occur 6 to 9 months following the accident.  While there has been

3   some recovery, Mr. Vella has been consistent in his core problem issues for almost five years."  AR

4   1170.  Dr. Pratt believed that Plaintiff had reached a psychological/psychiatric healing plateau, and

5   that he had a permanent disability associated with his ability to function adequately on an

6   occupational and social level.  While Plaintiff would benefit from continued psychological treatment,

7   it was unlikely that he was capable of making appropriate cognitive changes.  AR 1171.

8        Plaintiff had two sessions at Oasis Counseling on April 18 and May 30, 2014.  The therapist

9   noted that Plaintiff's stream of thought was without disorganization and he did not appear to be

10  under the influence of any type of abnormal internal stimuli.  "Sensorium was alert.  Cognitive

11  functioning was intact.  Thought style was inclusive of abstract ability.  Intelligence as assessed by

12  syntax, vocabulary and general interaction appeared to be in the average range.  Insight appeared fair

13  and judgment good."  AR 1173.  Plaintiff was casually dressed and groomed, and approached the

14  session in a calm and cooperative fashion.  No unusual mannerisms or gestures were noted.  Plaintiff

15  told the therapist that he had "post brain trauma seizure disorder" and he complained about panic

16  attacks, anger, depression and sleep problems.  The therapist noted on May 30, 2014 that Plaintiff

17  was a little sleepy on the increased dose of Prozac, but his mood was much improved. AR 1172.

18       The ALJ arranged for three medical experts to testify at the hearings on July 15, 2014 and

19  November 17, 2014.  None of these experts examined Plaintiff.  Dr. Lowell Sparks, a board certified

20  physician in internal medicine and endocrinology, reviewed Plaintiff's medical records.  He testified

21  that Plaintiff met Listing 1.08.  Dr. Sparks did not render any opinions regarding Plaintiff's

22  psychological issues.  AR 79-81.  Dr. James M. Haynes, a board certified neurologist, testified that

23  Plaintiff's neurological conditions did not meet a listing. AR 83-84.  With respect to Plaintiff's

24  complaints of headaches, he testified there must be a sustained treatment record to show that there is

25  some effort to deal with the headaches, and he did not find that in the records he reviewed.  Dr.

26  Haynes noted that there were "a lot of symptoms without objective deficits."  AR 82-84.  He testified

27  that Plaintiff's  inconsistent urine drug screen and refusal to undergo a second drug screen also raised

28  questions about his credibility.  AR 84.

1   Dr. Haynes stated that the ALJ might give Plaintiff a closed period of disability for a year

2   after the accident.  He stated that Plaintiff probably did lose consciousness in the accident and

3   qualified for a diagnosis of depression.  AR 84-85.  He agreed with Dr. Pratt that Plaintiff suffered

4   post-concussion syndrome and memory disturbance, but noted that his symptoms were totally

5   subjective.  Dr. Haynes stated that Plaintiff's physical injuries and surgeries were things that most

6   people recover from, and are temporary impairments that do not result in lifetime disability. AR 86.

7   He believed that Plaintiff had the residual functional capacity to perform light work.  AR 87.

8   Dr. Robert McDevitt, a board certified psychiatrist, testified at the hearing on November 17,

9   2014 that he reviewed Plaintiff's medical records, including the neurological and psychological

10  treatment records.  AR 43-47.  Dr. McDevitt's testimony was disjointed, confusing, and somewhat

11  inconsistent.  He testified that Plaintiff "probably at this point does have some low grade depression.

12  I don't get the impression he has severe PTSD."  AR 47.  He also testified that some of Plaintiff's

13  memory issues may be secondary to the medications he was taking.  Dr. McDevitt thought that

14  Plaintiff may equal Listing 12.04 and perhaps some elements of Listing 12.06.  Dr. McDevitt stated

15  that based on the neurologist's evaluation, Plaintiff should be able to do simple, repetitive light

16  work.  He testified that Plaintiff met listing 12.02 and perhaps listing 12.04.  AR 48.  He also

17  testified that "at this point we have a man who probably could do some light work or do some work

18  – he could have returned to work early in the situation.  Too bad he didn't, but apparently the light

19  work was not available. . . ."  AR 48.  Dr. McDevitt further indicated that Plaintiff equaled Listing

20  12.04 under the C3 criteria.  He stated:

21  I think that's the closest I can get.  I can't get any B criteria.  I don't
    have any real good objective evidence of a concentrate (sic).  You
22  know, he has subjective issues of concentration, but I don't have any
    objective measures that would support.  He's on medications that
23  would interfere with concentration. . . .  So it's very marginal.  It is
    giving him the benefit of the doubt. . . .  I think its too bad that he
24  hasn't returned to some kind of meaningful activity during this period
    of time.

25  AR 54-55.

26  Plaintiff testified that he had not worked since March 2, 2009 and was still receiving

27  worker's compensation benefits.  AR 60-61.  He still had a driver's license, but stated that "they"

28

18

wanted him to turn it in.  AR 63.  His mother, father or wife drove him to wherever he needed to go.

He tried to attend church every Sunday.  AR 64.   He was in pain every day and could not lay down,

sit or stand for long periods of time.  He prepared health shakes for himself and assisted in preparing

meals.  He worked on his memory workbook and tried to use the computer, but could not do so.  He

and his wife went out to visit a friend once or twice every two weeks and would stop at casinos to eat

dinner on the way back.  AR 65.  He testified that he could not work because of pain, memory loss

and the feeling that he wanted to injure other people all the time.  AR 66.  He felt very uncomfortable

around people.  AR 67.  He stated:  "I was knocked out three different times and woke up . . . in a

period of probably like 10, 15 seconds."  AR. 67.  He also testified that he had been involved in

arguments and grabbing-pushing incidents with family members and others.  AR 68.

Vocational expert Dr. Robin Generaux testified that Plaintiff's past work was performed at

the medium or heavy exertional level.  AR 70-71.  The ALJ asked her to assume a hypothetical

person of the same age, education and work experience as the Plaintiff and who was limited to

working at the light exertional level.  The hypothetical person would also be limited to performing

simple, repetitive tasks that required only occasional or routine interaction with co-workers and the

public. Dr. Generaux testified that the hypothetical person would not be able to perform any of

Plaintiff's prior work.  The person would, however, be able to perform the jobs of hand packager,

production helper and marking clerk for which there were substantial numbers of jobs available in

the national economy.  AR 70-72.  Dr. Generaux testified that the hypothetical person could perform

these jobs even if he was restricted to having no contact with the general public.  AR 72-73.

## C.       Administrative Law Judge's July 8, 2011 Decision.

The ALJ applied the five-step sequential evaluation process established by the Social

Security Administration in determining whether Plaintiff was disabled.  AR 15-32.  The ALJ found

that Plaintiff met the insured status requirements of the Social Security Act through December 31,

2014.  She also found that Plaintiff had not engaged in substantial gainful activity since March 2,

2009.  At step two, the ALJ found that Plaintiff had the following severe impairments: depression

and physical combination of residuals from September 2009 left shoulder surgery, past knee

surgeries, March 2010 left elbow surgery, August 2010 right ankle surgery and September 2011 right

elbow surgery. AR 18-19. At step three, the ALJ found that from March 2, 2009 through January 19, 2012, the severity of the combination of Plaintiff's impairments medically equaled the criteria of listing 1.08, 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR §§ 404.1520(d), 404.1525 and 404.1526).[6] The ALJ did not find that Plaintiff's mental impairments met or equaled a listing.

The ALJ extensively summarized the records relating to the diagnosis and treatment of Plaintiff's alleged mental impairments. AR 19-25. Her summary is interspersed with critical comments regarding the diagnosis or treatment of Plaintiff's alleged mental impairments, particularly those of Plaintiff's treating neuropsychologist, Dr. Ross, and the examining psychologist, Dr. Pratt. The Court highlights those findings which appear to form the basis for the ALJ's conclusion that Plaintiff did not have a disabling mental impairment after January 19, 2012.

The ALJ stated that there was no clinical basis in the record for a finding of traumatic brain injury. Plaintiff had a normal mini-MSE (mental status examination), a full scale IQ of 94 and performance IQ of 96, normal EEG, and normal brain MRI. Dr. Haynes testified that Plaintiff had no significant neurological findings or concerns, except for subjective complaints, including headaches and post-concussive syndrome which should have resolved in 12 months after the accident and were therefore not severe. AR 19-20.

The ALJ stated that Dr. Ross's "similarly-worded treatment notes would usually repeat that the claimant's 'post-concussive syndrome' was 'improved,' his memory impairment was 'improved,' his PTSD was 'improved,' and he was 'making good symptomatic progress overall.'" AR 20. After the initial six therapy sessions with Dr. Ross, Plaintiff was still not taking any psychotropic medication. As noted previously, the ALJ erroneously stated that Plaintiff did not see Dr. Ross during the six month period preceding the filing of his application for disability benefits in January 2012 and she implied that Plaintiff's visit to Dr. Ross on February 13, 2012 may have been an attempt to document continuous symptoms of PTSD and memory disturbances. AR 21. The ALJ

---

[6]Listing 1.08 is an impairment resulting from soft tissue injury of an upper or lower extremity, trunk, or face and head, under continuing surgical management, as defined in 1.00M, directed toward salvage or restoration of major function, and such major function was not restored or expected to be restored within 12 months of onset.

1  stated that even after Plaintiff filed his disability application, Dr. Ross continued to note "'a gradual

2  trend of improvement in symptoms.'" AR 22.

3       The ALJ noted Dr. Mashood's November 17, 2011 statement that Plaintiff was not anxious

4  or depressed and that he did not believe Plaintiff would require long-term psychotropic medications

5  and should be weaned off them.  The ALJ also referenced Dr. Broeske's statements that the low dose

6  psychotropic medications prescribed to Plaintiff in December 2011 were helpful and resulted in

7  fewer panic attacks.  AR 21.  She cited Dr. Mashood's statement in July 2012 that Plaintiff was now

8  reporting a wide range of physical and mental symptoms which he did not have when Dr. Mashood

9  saw him at the end of January 2012.  The ALJ further stated that by August 2012 Dr. Mashood was

10  challenging Plaintiff's credibility for "a host of reasons" and then discharged Plaintiff from his care

11  in February 2013 after the toxicology test showed that he was not taking prescribed pain

12  medications.  AR 22.

13       The ALJ cited Dr. Perlotta's May 2013 report that Plaintiff was friendly and cooperative,

14  demonstrated good social skills and should be able to interact appropriately with others, and "was

15  fully able to carry out simple 1 or 2 step instructions."  AR 23.   The ALJ rejected examining

16  psychologist Dr. Pratt's January 2014 opinion that Plaintiff had brain damage, noting that he was not

17  a medical doctor and his opinion regarding brain damage was not supported by the medical records.

18  The ALJ also stated that Dr. Pratt was apparently misinformed that insurance problems caused

19  Plaintiff's narcotics to be discontinued.  The ALJ accorded no weight to Dr. Pratt's opinion that

20  Plaintiff would have a permanent disability due to inability to function on any occupational or social

21  level.  AR 24.

22       The ALJ also summarized the hearing testimony of Dr. Haynes and Dr. McDevitt, noting that

23  Dr. McDevitt testified that there was no organic basis to support a diagnosis of traumatic brain injury

24  or organic brain disorder, and that Plaintiff had only low grade depression and non-severe PTSD.

25  AR 25.  The ALJ discounted Dr. McDevitt's testimony that Plaintiff possibly satisfied the C3

26  criterial under Listing 12.04[1] because it was primarily based on Plaintiff's subjective complaints

27  _____

28      [1]Listing 12.04 concerns "affective disorders" were are characterized by a disturbance of mood

1   which were not fully credible.  The ALJ stated: "If these symptoms supposedly caused by the stress

2   and anxiety of worker's compensation litigation were so severe as to be of listing level in

3   combination, there is no explanation for the lack of psychiatric treatment in this case.  Further, if

4   these subjective symptoms were as debilitating as alleged, there is no reason for the repeated

5   comments by the neuropsychologist Dr. Ross that the claimant was always continuing the 'trend of

6   improvement' despite only taking low doses of psychotropic medication."  AR 26.  The ALJ agreed

7   with Dr. McDevitt's testimony that Plaintiff did not have traumatic brain injury (TBI) under Listing

8   12.02.[2]  The ALJ noted that the mini-mental status examination was normal (29/30), and the EEG

9   and brain MRI studies were also normal.  She further noted that Plaintiff drove himself home on the

10  day of the accident and that Dr. Ross found no evidence of cognitive impairment or any significant

11  neurological impairment.  AR 26.

12      The ALJ also found that Plaintiff did not meet or medically equal Listing 12.06[3] for anxiety

13  disorder or PTSD because there was no evidence of significant impairment and Dr. McDevitt

14  considered Plaintiff's anxiety or PTSD to be non-severe.  The ALJ rejected Plaintiff counsel's

15  proposed Listing 12.07[4] "because there was no clinical diagnosis in the record of a somatoform

16  disorder."  AR 26.  The ALJ rejected an impairment under Listing 12.08, noting that while there had

17  been several reported instances of hostility and irrationality on claimant's part, the reports fell short

18  of establishing a medically determinable personality disorder at 12.08.[5]  The ALJ further noted that

19  Dr. Ross twice took the opportunity to emphasize that the claimant was able to independently control

20

21

accompanied by a full or partial manic or depressive syndrome.

22
23  [2]Listing 12.02 concerns "organic mental disorders" which involve psychological or behavioral abnormalities associated with dysfunction of the brain.

24
25  [3]Listing 12.06 concerns "anxiety related disorders" in which "anxiety is either the prominent disturbance or it is experienced if the individual attempts to master symptoms."

26  [4]Listing 12.07 concerns "somatoform disorders" which are "[p]hysical symptoms for which there are no demonstrable organic findings or known physiological mechanisms."

27
28  [5]Listing 12.08 concerns "personality disorders" which exist when "personality traits are inflexible and maladaptive and cause either significant impairment in social or occupational functioning or subjective distress."

his anger symptoms.  AR 26-27.

The ALJ concluded that beginning January 20, 2012 and thereafter, the severity of Plaintiff's mental impairment did not meet or medically equal listings 12.04, 12.06 and 12.07.  AR 27.  She found that the "paragraph B" criteria of these listings was not satisfied because Plaintiff's impairment did not result in at least two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.  The ALJ stated that "[a] marked limitations means more than moderate but less than severe.  Repeated episodes of decompensation, each of extended duration, means three episodes within 1 year, or an average of once every 4 months, each lasting at least 2 weeks."  AR 27.

The ALJ found that Plaintiff had no more than mild restrictions on activities of daily living. He was able to make simple meals, dress and bath himself, shop in stores for food, apartment supplies and clothes; travel by car, and attend church weekly.  The ALJ found that Plaintiff had only moderate limitations in social functioning.  He maintained a long term relationship/marriage, kept appointments, shopped in stores and attended church.  He also engaged in bicycling and walking, visited friends every couple of weeks, had dinner at a casino, and went to movies. The ALJ also noted Dr. Perlotta's finding that Plaintiff was friendly and cooperative, demonstrated good social skills, and in her opinion would be able to interact appropriately with others in a work setting.  AR 27-28.

The ALJ concurred with Dr. McDevitt's opinion that Plaintiff had only mild difficulties with concentration, persistence or pace.  He read the bible on a regular basis, did computer programs, and traveled by car, shopped and attended church.  The ALJ further stated: "Importantly, the claimant has demonstrated the ability to do oral serial 7's—14 times consecutively without making an error [], and mental status evaluations consistently observed his 'intact' cognition [] with 'well organized' speech [] and stream of thought 'without disorganization []'."  AR 28.  She noted that during the hearing, Plaintiff did not appear unable to follow the proceedings, and did not require excessive repetition or redirection due to poor focus.  The ALJ also found that Plaintiff had experienced no episodes of decompensation of extended duration.  There was no "psychiatric hospitalization or

emergent care, no psychiatric inpatient treatment, and not even psychiatric outpatient treatment."
AR 28. Based on the foregoing, the ALJ also concluded that Plaintiff did not meet or equal one of
the listings under the "paragraph C" criteria. AR 28.

Prior to step four, the ALJ found that Plaintiff had the residual functional capacity to perform
light work as defined in 20 CFR 404.1567(b), subject to the limitation that he could perform simple
repetitive tasks requiring no more than occasional and routine interaction with co-workers and the
general public. AR 28-29. In making this finding, the ALJ again rejected Dr. Pratt's opinion that
Plaintiff suffered from traumatic brain injury. AR 29. She noted that there were no full functional
capacity assessments from any of Plaintiff's treating physicians. Although "isolated comments"
from Dr. Ross and Dr. Mashood might suggest a possibly more restrictive limitation for claimant, the
record indicated that Plaintiff received only conservative treatment after January 20, 2012. The ALJ
stated that "[t]he claimant does not see a psychiatrist, has never seen a psychiatrist, and apparently no
physician feels it is important for him to be under active medical management by a psychiatrist." AR
29. The ALJ further found that Plaintiff's low average IQ did not prevent him from performing
simple repetitive tasks. AR 29.

The ALJ also found that Plaintiff's and his wife's statements and testimony regarding the
severity of his physical and mental impairments after January 2012 were not credible. The ALJ
noted that the Plaintiff contended that he was required to use a cane, braces and a wheelchair "all the
time." AR 30. However, the medical records "seldom if ever" referenced the use of such devices.
AR 30. Plaintiff testified that his maximum capacity for paying attention was only 15 minutes, but
reported enjoying going to movies. Plaintiff testified that he could not use a computer, but told Dr.
Ross that he could use computer programs. The ALJ further noted that Dr. Mashood and another
physician (Dr. Reed) questioned Plaintiff's credibility regarding the severity of his physical
symptoms and subjective psychological symptoms. AR 30. The ALJ also rejected the credibility of
Plaintiff's testimony that if he had to work, he was "going to kill someone." AR 30. The ALJ noted
that the few references to Plaintiff's temper and hostility in Dr. Ross's records "were always
conjoined . . . with softening statements such as he was able to control these symptoms
independently." AR 31. Plaintiff was no taking anti-psychotic medication to control his anger

1  symptoms and was not seeing a psychiatrist.  There was also no evidence that Plaintiff incurred any

2  legal trouble due to his alleged violent thoughts or veiled threats.  AR 31.

3       At step four, the ALJ stated that the vocational expert's testimony supported the finding that

4  Plaintiff did not have the residual functional capacity to perform his past work.  The ALJ found,

5  however, at step five, that Plaintiff had the residual functional capacity to perform the light

6  exertional level jobs identified by the vocational expert: entry level hand-packer, production helper,

7  and marking clerk.  The ALJ therefore concluded that Plaintiff was "capable of making a successful

8  adjustment to work that exists in significant numbers in the national economy," and was not disabled

9  as of January 20, 2012.  AR 32.

10  **DISCUSSION**

11  **I.**     **Standard of Review**

12       A federal court's review of an ALJ's decision is limited to determining only (1) whether the

13  ALJ's findings were supported by substantial evidence and (2) whether the ALJ applied the proper

14  legal standards.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Delorme v. Sullivan,* 924

15  F.2d 841, 846 (9th Cir. 1991).  The Ninth Circuit has defined substantial evidence as "more than a

16  mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might

17  accept as adequate to support a conclusion."  *Woish v. Apfel*, 2000 WL 1175584 (N.D. Cal. 2000)

18  (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)); *see also Lewis v. Apfel*, 236 F.3d

19  503 (9th Cir. 2001).  The Court must look to the record as a whole and consider both adverse and

20  supporting evidence.  *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993).  Where the factual findings

21  of the Commissioner of Social Security are supported by substantial evidence, the District Court

22  must accept them as conclusive.  42 U.S.C. § 405(g).  Hence, where the evidence may be open to

23  more than one rational interpretation, the Court is required to uphold the decision.  *Moore v. Apfel*,

24  216 F.3d 864, 871 (9th Cir. 2000) (*quoting Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984)).

25  *See also Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  The court may not substitute its

26  judgment for that of the ALJ if the evidence can reasonably support reversal or affirmation of the

27  ALJ's decision.  *Flaten v. Sec'y of Health and Human Serv.*, 44 F.3d 1453, 1457 (9th Cir. 1995).

28       It is incumbent on the ALJ to make specific findings so that the court need not speculate as to

25

the findings. *Lewin v. Schweiker*, 654 F.2d 631, 635 (9th Cir. 1981), citing *Baerga v. Richardson*, 500 F.2d 309 (3rd Cir. 1974). In order to enable the court to properly determine whether the Commissioner's decision is supported by substantial evidence, the ALJ's findings "should be as comprehensive and analytical as feasible and, where appropriate, should include a statement of subordinate factual foundations on which the ultimate factual conclusions are based." *Lewin*, 654 F.2d at 635.

In reviewing the administrative decision, the District Court has the power to enter "a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). In the alternative, the District Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." *Id.*

## II.   Disability Evaluation Process

To qualify for disability benefits under the Social Security Act, a claimant must show that: (a) he/she suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less that twelve months; and (b) the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999); *see also* 42 U.S.C. § 423(d)(2)(A). The claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179, 182 (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996). If the claimant establishes an inability to perform his or her prior work, the burden shifts to the Commissioner to show that the claimant can perform a significant number of other jobs that exist in the national economy. *Hoopai v. Astrue*, 499 F.3d 1071, 1074-75 (9th Cir. 2007).

Social Security disability claims are evaluated under a five-step sequential evaluation procedure. *See* 20 C.F.R. § 404.1520(a)-(f). *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). The claimant carries the burden with respect to steps one through four. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999). If a claimant is found to be disabled, or not disabled, at any point

during the process, then no further assessment is necessary.  20 C.F.R. § 404.1520(a).  The five steps of the evaluation process are outlined in the ALJ's decision and will not be repeated here.  AR 16-17. As the ALJ stated in her decision, if the claimant is found disabled at any point in the process, then the ALJ must also determine whether the disability continued through the date of the decision.  AR 17.  In order to find that the disability did not continue through the date of decision, the ALJ must show that medical improvement occurred which related to the claimant's ability to work or that exceptions apply.  In making this determination the ALJ must follow an additional eight-step evaluation process set forth in 20 CFR § 404.1595(f).  AR 17-18.

### III.   Whether the ALJ Erred in Determining that Plaintiff's Mental Impairments Were Not Disabling.

In concluding that Plaintiff was not disabled as a result of his mental impairments, the ALJ impliedly rejected Dr. Ross's September 17, 2013 opinion that Plaintiff's mental conditions rendered him unable to work.  The ALJ expressly rejected the similar opinion of examining psychologist Dr. Pratt.  The ALJ gave greater weight to examining psychologist Dr. Perlotta's opinion that Plaintiff demonstrated good social skills, was able to interact with others, and carry out simple one or two step instructions.  The ALJ accepted the opinions of non-examining medical experts, Dr. Haynes and Dr. McDevitt, that Plaintiff did not have traumatic brain injury or severe PTSD.  The ALJ, however, rejected Dr. McDevitt's opinion that Plaintiff's affective disorder met listing 12.04. AR 47.  The ALJ's decision was also based on her finding that Plaintiff's statements regarding the severity of his physical and mental impairments were not credible and that his activities of daily living indicated that he was capable of limited light work.  AR 31.

As a general rule, more weight should be given to the opinion of a treating physician than to the opinion of physicians who do not treat the claimant.  *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995).   The opinion of an examining physician is also generally entitled to greater weight than that of a non-examining physician.  *Id.*, at 1012, citing *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1198 (9th Cir. 2008).  The weight afforded to a non-examining physician's opinion depends on the degree to which he provides supporting explanation for his opinions.  *Id.*  In explaining the grounds for according greater weight to the

opinions of a treating physician, 20 C.F.R. § 404.1527(c)(2) states that a treating physician is likely to be "most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultive examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2).  If the treating physician's opinion on the nature and severity of the claimant's impairment is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record, it will be given controlling weight.  *Id.*

Even if the treating physician's opinion is not given controlling weight, the ALJ is required to consider certain factors in determining the weight to be given to the opinion.  20 C.F.R. § 404.1527(c)(2).  These factors include (i) the length of the treatment relationship and the frequency of examination and (ii) the nature and extent of the treatment relationship.  *Id.*  In evaluating the opinions of treating, examining and nonexamining physicians, the ALJ should consider the extent to which the opinion is supported by relevant evidence, particularly medical signs and findings; the extent to which the opinion is consistent with the record as a whole; whether the physician is a specialist opining within the area of his specialty; and other factors, including the physician's familiarity with Social Security disability programs and their evidentiary requirements.  20 C.F.R. § 404.1527(c)(3)-(6).

If a treating or examining doctor's opinion is contradicted by another doctor's opinion, the ALJ may only reject it by providing specific and legitimate reasons supported by substantial evidence.  *Garrison v. Colvin*, 759 F.3d at 1012.  "This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be 'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'" *Id.*, quoting *Orne v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007).  To satisfy the substantial evidence requirement, the ALJ should set forth a detailed and thorough summary of the facts and conflicting clinical evidence, state his interpretations thereof, and make findings.  *Id.,* citing *Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  "'The ALJ must do more than state conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors' are correct.'" *Id.*

The ALJ is not bound by a treating physician's opinion that a patient is unable to work. *McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011). While a treating physician's evaluation of a patient's ability to work may be useful in the disability determination, a treating physician ordinarily does not consult a vocational consultant or have the expertise of one. "An impairment is a purely medical condition. A disability is an administrative determination of how an impairment in relation to education, age, technological, economic, and social factors, affects the ability to engage in gainful activity." The law reserves the disability determination to the Commissioner. *Id.* at 884, citing 20 C.F.R. § 404.1527(e)(1). *See also Kibble v. Comm'r*, 584 Fed.Appx. 717, 719 (9th Cir. Sept. 2, 2014) (unpublished memorandum) (ALJ was not required to defer to a physician on the ultimate determination of disability).

Dr. Ross performed psychological and neuropsychological evaluations of Plaintiff in August and September 2011 and thereafter provided psychological counseling to Plaintiff on a bimonthly basis through June 11, 2014, with a few follow-up visits thereafter. The duration and frequency of Dr. Ross's treatment generally supports giving greater weight to her opinions regarding the severity of Plaintiff's psychological symptoms than to the opinions of examining psychologists such as Dr. Perlotta and Dr. Pratt who only saw Plaintiff on one or a few occasions. The ALJ correctly noted that Dr. Ross's "similarly worded treatment notes would usually repeat that the claimant's 'post-concussive syndrome' was 'improved,' his memory impairment was 'improved,' his PTSD was 'improved,' and he was 'making good symptomatic progress overall.'" AR 20. Contrary to Plaintiff's argument, this statement does not misrepresent Dr. Ross's progress notes. The progress notes, in fact, consist of general, vague and repetitive descriptions of Plaintiff's subjective symptoms and of Dr. Ross's impressions.

*Garrison v. Colvin*, 759 F.3d at 1017, notes however, that "[r]eports of 'improvement' in the context of mental health issues must be interpreted with an understanding of the patient's overall well being and the nature of her symptoms. . . . They must also be interpreted with an awareness that improved functioning while being treated and while limiting environmental stressors does not always mean that a claimant can function effectively in the workplace." Two years after commencing psychological treatment, Dr. Ross stated in her September 17, 2013 letter that Plaintiff was still

experiencing severe symptoms of depression, anxiety and inability to control anger that rendered him incapable of successfully functioning in a work environment.  The ALJ, however, did not even discuss Dr. Ross's September 17, 2013 letter.

The ALJ cited other evidence in the record that appeared to contradict Dr. Ross's opinion regarding the severity of Plaintiff's psychological symptoms.  The ALJ noted that once low dose psychotropic medications were prescribed to Plaintiff in December 2011, he reported fewer panic attacks.  AR 21.  Dr. Broeske also stated in March 2012 that Plaintiff benefitted from the increased dosage of Cymbalta and had less generalized pain and depressive symptoms.  The medication also provided some relief for his headaches.  AR 564.  The ALJ also noted Dr. Mashood's and Dr. Reed's reports which indicated that Plaintiff did not appear to be anxious or depressed during their examinations, as well as their observations that his subjective symptoms of physical pain were inconsistent with the objective medical findings.  The ALJ also noted Dr. Mashood's findings regarding Plaintiff's non-use of prescribed pain medication which went to the issue of his credibility.  AR 22.  The ALJ further noted Dr. Perlotta's May 2013 findings that Plaintiff was friendly and cooperative, demonstrated good social skills, and despite some memory impairment, appeared capable of carrying out simple 1 or 2 step instructions.  AR 23.

Some of the ALJ's findings, however, call into question the legitimacy of her reasons for impliedly rejecting Dr. Ross's opinion regarding the severity of Plaintiff's psychological symptoms.  The ALJ incorrectly stated that Plaintiff did not receive counseling from Dr. Ross during the six months preceding the filing of his disability application in January 2012.  AR 21.  The ALJ suggested that Plaintiff's February 2012 visit with Dr. Ross may have been an attempt to document continuous symptoms of PTSD and memory disturbances that were not otherwise supported by the record.  Plaintiff, however, had counseling sessions with Dr. Ross approximately twice a month from September 2011 through January 2012.

The ALJ also made repeated references to the fact that Plaintiff did not see a psychiatrist or receive psychiatric treatment.  These references include the following:  "[T]he record indicates that the claimant was not seeing a neurologist, a psychiatrist or even a psychotherapist, other than the minimally-informative Dr. Ross, although he continued to see a speech therapist for 'unknown

reasons' as opined by Dr. Mashood."[6]  AR 22.  "The claimant would continue to see Dr. Ross . . . and without psychiatric specialist referral at any time."  AR 24.  "If these symptoms supposedly caused by the stress and anxiety of worker's compensation litigation[7] were so severe as to be of listing level in combination, there is no explanation for the lack of psychiatric treatment in this case." AR 26.  "The record documents no psychiatric hospitalization or emergent care, no psychiatric impatient treatment, and not even psychiatric outpatient treatment."  AR 28.  "The claimant does not see a psychiatrist, has never seen a psychiatrist, and apparently no physician feels it is important for him to be under active medical management by a psychiatrist."  AR 29.[8]

The ALJ's emphasis on the lack of psychiatric care appears to emanate from Dr. Mashood's statements on July 19, 2012 and consistently thereafter that Plaintiff should be evaluated by a psychiatrist.  AR 932.  It is evident that Dr. Mashood did not believe that Plaintiff was suffering from significant depression, anxiety or PTSD.  Nor did he believe that the therapy provided by Dr. Ross was necessary.  It may have been Dr. Mashood's opinion that a psychiatrist was more qualified to evaluate Plaintiff's mental condition than was a psychologist.  He clearly anticipated that a psychiatric examination would result in a finding that Plaintiff did not have significant depression or anxiety.  AR 914.  Dr. Pratt, in his January 2014 report, however, provided a counter-argument that Plaintiff's psychological condition was more appropriately treated by a psychologist than by a psychiatrist.  AR 1170.

20 C.F.R. § 404.1513(a)(2) recognizes that licensed or certified psychologists are acceptable medical sources to establish whether a claimant has a medically determinable mental impairment.  In fact, the Bureau of Disability Adjudication referred Plaintiff for examination and evaluation by Dr.

---

[6]Plaintiff was referred to the speech therapist by Dr. Broeske pursuant to a recommendation by Dr. Ross. AR 574, 595.

[7]The records do not indicate that Plaintiff's stress and anxiety were caused by worker's compensation litigation.  Rather, they indicate that Plaintiff's alleged PTSD, depression and anxiety emanated from the physical trauma of the March 2, 2009 accident and Plaintiff's subsequent medical treatment, including several surgeries on his upper and lower extremities.

[8]The Commissioner's brief also references the fact that "Plaintiff never sought treatment from a psychiatrist." *Cross Motion (#17), pg. 5:11-12.*

1  Perlotta, a psychologist.  A licensed psychologist is clearly qualified to diagnose and treat mental

2  illnesses such as those allegedly suffered by Plaintiff.

3      Plaintiff's medical care was under the management of the worker's compensation

4  administrator.  Although Dr. Mashood recommended that Plaintiff be referred to a psychiatrist, there

5  is no indication that he was, in fact, referred for such an examination.  Nor is there any evidence that

6  Plaintiff failed to attend a scheduled psychiatric examination.

7      There is also no indication that the ALJ considered the fact that Dr. Mashood's relationship

8  to Plaintiff was not simply that of a treating physician.  Dr. Mashood was the "Designated

9  Impairment Evaluator," charged with determining when Plaintiff reached maximum medical

10  improvement for his work related injuries and could be released to return to work.  Unlike a treating

11  physician whose interest and potential bias may be in favor of the patient, Dr. Mashood's potential

12  bias may have been in favor the worker's compensation insurer's interest in terminating Plaintiff's

13  medical treatment and certifying him to return to work.  This does not mean that Dr. Mashood's

14  opinions regarding Plaintiff's alleged mental impairments or need for ongoing psychological

15  counseling were wrong.  The ALJ, however, should have considered and addressed Dr. Mashood's

16  role in managing Plaintiff's medical treatment before accepting, at face value, his assertions that

17  Plaintiff needed to be examined by a psychiatrist.

18      In any event, the ALJ did not explain why the lack of psychiatric examination or treatment

19  was significant, given that Plaintiff was under the continuing and regular care of a licensed

20  psychologist from September 2011 through June 2014.  Did the ALJ believe that severe mental

21  impairments can only be diagnosed and treated by psychiatrists?  If so, what is the basis for that

22  belief?  The ALJ failed to demonstrate that the lack of psychiatric examination or treatment was a

23  legitimate reason to reject Dr. Ross's opinion regarding the severity of the Plaintiff's psychological

24  symptoms.

25      The Court must determine whether ALJ's errors were harmless.  Harmless error principles

26  apply in Social Security disability determinations.  *Molina v. Astrue*, 674 F.3d 1104, 1115 (9th Cir.

27  2012), citing *Stout v. Comm'r of Soc. Sec. Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (collecting

28  cases).  "[A]n ALJ's error is harmless when it is 'inconsequential to the ultimate nondisability

1    determination.'" *Id.* citing *Carmickle v. Comm'r of Soc. Admin.*, 533 F.3d 1155, 1162 (9th Cir.

2    2008), *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) and *Robbins v. Soc. Sec. Admin.*,

3    466 F.3d 880, 885 (9th Cir. 2006); and *Stout*, 454 F.3d at 1055.  "In other words, in each case we

4    look at the record as a whole to determine whether the error alters the outcome of the case."

5           The ALJ's error in stating that Plaintiff did not treat with Dr. Ross in the six month period

6    prior to the filing of his disability application, standing alone, might be harmless error.  The ALJ's

7    repeated emphasis on the lack of psychiatric examination or treatment, however, cannot be viewed as

8    inconsequential to her ultimate disability determination.  Two psychologists, Dr. Ross and Dr. Pratt,

9    opined that Plaintiff suffered from severe psychological impairments that prevented him from being

10   able to function in any working environment.  Dr. Perlotta, however, arguably found that Plaintiff's

11   mental impairments were not so severe as to prevent him from working.  The non-examining

12   psychiatrist, Dr. McDevitt, gave confusing and inconsistent hearing testimony as to whether

13   Plaintiff's mental impairments met or medically equaled a listing.  Although other evidence in the

14   record could support a conclusion that Plaintiff's mental impairments did not preclude him from

15   working as of January 20, 2012, the ALJ's factual mistake regarding Dr. Ross's treatment and her

16   unsupported reliance on the lack of psychiatric treatment as grounds for discrediting Dr. Ross's

17   opinion and Plaintiff's credibility were not inconsequential to her determination that Plaintiff's

18   mental impairments were not disabling.  Reversal of the ALJ's decision is therefore required.

19          The Ninth Circuit has established a three-part credit-as-true standard which must be satisfied

20   in order to remand a case to an ALJ with instructions to calculate and award benefits.  The test

21   requires the court to find that (1) the record has been fully developed and further administrative

22   proceedings would serve no useful purpose; (2) the ALJ failed to provide legally sufficient reasons

23   for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly

24   discredited evidence was credited as true, the ALJ would be required to find the claimant disabled on

25   remand.  *Garrison*, 759 F.3d at 1020, citing *Ryan v. Commissioner of Social. Sec.*, 528 F.3d 1194,

26   1202 (9th Cir. 2008); *Lingenfelter v. Astrue*, 504 F.3d 1028, 1041 (9th Cir. 2007); *Orn v. Astrue*, 495

27   F.3d 625, 640 (9th Cir. 2007); *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004); and *Smolen

28   v. Chater*, 80 F.3d 1273, 1292 (9th Cir. 1996).  *Garrison* states that it may be an abuse of discretion

not to remand with direction to make payment when all three conditions are met.  The court stated, however, that the rule envisions some flexibility and the case should be remanded for further proceedings if an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled.  *Id.* at 1020-21.  More recently in *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1101-02, the court stated that even when the elements of the credit-as-true rule are present, the decision to remand for additional evidence or simply to award benefits is in the discretion of the court.

In this case, the uninformative nature of Dr. Ross's progress notes provide grounds to question her statements that Plaintiff was experiencing severe depression, anxiety and anger.  This also makes it difficult to evaluate and reconcile her repeated statements that Plaintiff's symptoms were improving with her opinion, after two years of therapy, that Plaintiff was still experiencing severe and disabling psychological symptoms.  The subjective nature of Plaintiff's complaints, his inconsistent statements about whether he lost consciousness in the accident, the observations of Dr. Mashood, Dr. Reed and Dr. Perlotta that Plaintiff did not display significant or severe symptoms of memory loss, depression or anxiety, and the credibility issues regarding his complaints of physical pain create serious doubt as to whether he was, in fact, disabled.

## CONCLUSION

The ALJ's decision should be reversed because she failed to provide specific and legitimate reasons for rejecting the opinions of Plaintiff's treating psychologist regarding the severity of Plaintiff's mental impairments after January 19, 2012.  The record as a whole, however, casts serious doubts as to whether Plaintiff was disabled after January 19, 2012.  This case should therefore be remanded for further hearing and determination as to whether Plaintiff was disabled as a result of mental impairments.  Accordingly,

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Remand (ECF No. 12) be **granted** and that this case be remanded to the Social Security Administration to determine whether Plaintiff was disabled after January 19, 2012.  The Acting Commissioner's Cross-Motion to Affirm (ECF No. 17) should be **denied**.

34

**NOTICE**

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days.  The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time.  *Thomas v. Arn*, 474 U.S. 140, 142 (1985).  This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court.  *Martinez v. Ylst,* 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).

DATED this 3rd day of August, 2016.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge